CASE 122—ACTION BY THE COMMONWEALTH AGAINST J. S. SWEENEY,
&C. FOR BREACH OF HIS BOND AS STATE AUDITOR.—NOVEMBER 2.

# Sweeney, &c. v. Commonwealth.

APPEAL FROM FRANKLIN CIRCUIT COURT—JAMES E. CANTRILL, CIR-
CUIT JUDGE.

JUDGMENT FOR PLAINTIFF AND DEFENDANTS APPEAL. REVERSED.

MILITIA—EXPENSES—APPROPRIATION—LIABILITY OF STATE AUDITOR.

1. Ky. St. 1903, sec. 2705, fixes the amount of compensation
to be received by the State militia when called into active service,
and declares "the same to be paid out of the treasury" on warrant
of the auditor. Section 2672 makes it the duty of the Governor
when necessary to order the militia into active service. Sec
tion 2707, adopts the acts of Congress for the Government of the
Federal army, so far as applicable to the State. HELD, that the
expenses of the militia, when called into active service, which ex-
ceed the general appropriation of section 2704, are payable out
of the treasury without any special appropriation.
2. The State auditor is not liable on his bond for the amount paid
for the expenses of the State militia on vouchers signed by per-
sons purporting to be acting as governor and adjutant general,
though such persons were wrongfully so acting, if the amount
so paid was in fact a just claim against the State.
3. Under Ky. St. 1903, sec. 2672, the governor has authority, when
he deems it necessary, to order into service the militia of the
State. The acting govenor, in his discretion, January 30, 1900,
ordered into active service certain regiments of the militia of the
State. January 31st, a contestant for the office of governor issued a
proclamation ordering such militia to return to their homes,
which proclamation was not communicated to the officers in
charge of the militia. February 2d, such claimant was declared
duly elected by the Legislature. After such qualification, and
after the assassination of the person qualifying, the lieutenant
governor qualified as governor on February 3. The claims of
the militia for compensation while in service and claims for sup-
plies were approved by the acting governor who ordered the
militia into service. HELD, that the expenses of the militia while
they remained in active service, and until regularly discharged
from duty by the order of their superior officer, were valid
and just claims against the State.

Sweeney v. Commonwealth.

ST. JOHN BOYLE, D. W. LINDSEY, H. CLAY HOWARD, JOHN S. SMITH, HAZELRIGG & CHENAULT, FOR APPELLANTS.

### QUESTIONS DISCUSSED AND AUTHORITIES.

1. Only the governor has power to order the State Guard into active service; and it is his province alone to decide if the exigency exists for the exercise of the power, and the manner of its exercise, and his decision is conclusive. Constitution, secs. 75, 222; Ky. Stats., secs. 1625, 2659, 2660, 2672, 2691, 2705; Chapin v. Ferry, 15 L. R. A., 116, and note, 2706; 9 Peters, 675.

2. What may be stricken from a pleading, Code sec. 121; Ency. P. & P:. vol. 19, pp. 187, 189; Chitty on Pleading, vol. 1 p. 230; Woods v. Morrill, 1 Johns, Chy. (N. Y.), 106.

3. In contests for governor or lieutenant-governor, board of contest must make report to each House of the General Assembly, and each House must act. Constitution, secs, 29, 90; Act March 10th, 1898, sec. 8.

4. The presence of twenty Senators requisite to constitute a quorum of the Senate and no quorum of that body present on January 31st or February 2, 1900. Constitution, sec. 37; Callopy v. Cloherty, 18 Ky. Law Rep., 1061; Bybee v. Smith, 22 Ky. Law Rep., 1648; Rex. v. Devonshire, 1 Barn, & C.; Rex. v. Bower, 1 Barn. & C., 492; Rex. v. May, 1 Barn. & Ad., 483; Rex v. Morris, 4 East., 17; Rex. v. Bellringer, 4 T. R., 810; Rex. v. Miller, 6. T. R., 268; Cushings L. & P. of Leg. Assemblies, sec. 261; Taylor v. Taylor, 10 Minn., 107; Story on Const., pp. 141, 145, 157, 161 Smith's Stat. & Const. L., 695; State v. Ellington, 117 N. C., 158; 53 Am., S. R., 580.

5. The alleged resignation of Mr. Goebel as Senator was not effected. Constitution, secs. 83, 85; Ky. Stats., secs. 1524, 1530.

6. Courts in cases involving life, liberty or property have jurisdiction to enquire into and pass upon the organization and legality of action of the General Assembly. Cohens v. Virginia, 19 U. S., 264; In re Gunn, 19 L. R. A., 529; Burnam v. Morrisey, 74 Am. Dec., 676; Constitution, sec. 2.

7. Neither of the alleged meetings of the Houses of the General Assembly, either separate or joint, on January 31st or February 2, 1900, were legal meetings or authorized to transact business.    Act. Jan. 31st, 1814; 5 Litt. Laws, p. 153; Ky. Stats., sec. 3942; Constitution, sec. 41; Taylor v. Beckham, 178 U. S., 584; Morawetz on Corporations, sec. 356; Boone on Corporations, sec. 63; Springfield v. Peoples Dep. Bank, 23 Ky. Law Rep., 519; Scott v. Pendley, &c., 24 Ky. Law Rep., 1432; Am. & Eng. Ency. of Law, vol. 19, p. 465.

8. No journal was kept or published by either house of the General Assembly from January 26, 1900, to the end of the session as is requred by law. Constitution, sec. 40; Montgomery Beer Bottling Works v. Gaston, 85 Am. S. R., 42.

9. The State can not recover damages on an officer's bond without allegation and proof of damage, and the recovery can only be for the amount of such damage. Commonwealth v. Todd, 9 Bush, 708; Commonwealth v. Owensboro R. R. Co., 81 Ky., 572; Sinking Fund v. Northern Bank, 1 Met., 174, 196; Harrison v. Harrison, 1 Litt., 137, 144; Com. v. Bradley, 4 J. J. M., 209; Terrell v. Rowland, 86 Ky., 79; Ky. Stats., sec. 2705; State v. Batz, 44 Wis., 624; U. S. Rev. Stats., secs. 1061, 1062.

10. If defendants are to be held liable because Taylor was not governor after February 2d, then the defendants contend that the contest between Taylor and Goebel was never decided under any process of law, and that to deprive them of their property on that theory, is to take such property without due process of law, in violation of the Constitution of the United States. Constitution of the United States, 14th Amendment; Taylor v. Beckham, 178 U. S., 548.

ADDITIONAL AUTHORITIES, BY H. CLAY HOWARD.

1. *De facto* officer. 61 Am. St. Rep., 893; 20 Am. St. Rep., 337; 19 Indiana, 358; 17 Kansas, 471; 23 Am. St. Rep., 51; 23 Indiana, 449; 12 Kansas, 314; 3 Am. St. Rep., 181; 9 Am. St. Rep., 412; 37 Am. St. Rep., 829; Cooley Constitutional Limitations, 5th Ed., 750; 33 Am. Dec., 346; 55 Am. Rep., 65; 32 Am. St., Rep., 239; 83 Kentucky, 147; 3 Illinois, 79; 1 Wisconsin, 513; 1 Cranch, U. S., 137; 173 U. S., 454.

2. Title to office determined by *quo warranto*, 3 Am. St. Rep., 176; Blackwell on Tax Titles, 117; 27 Minnesota, 293; 12 Kansas, 308; 17 Kansas, 468.

JOHN W. RAY, ATTORNEY FOR APPELLEE.

1. Our contention is, that the warrants for which the most of the money sued for was audited, was not signed by the legal *de jure* governor, nor by the legal *de jure* adjutant general, and were not therefore a legal claim against the State, and this fact was known to the appellant.

2. It was never intended by the Constitution nor by the Legislature, that the purse strings of the State should be given over to the governor to be used by him under the head of the active militia when in fact or by possibility it may be used for his own personal ends.

3. The money appropriated, or much of it, was never intended to pay the militia to keep down riot and bloodshed, but it was for the purpose of keeping Taylor in the possession of the books and papers and office room pertaining to the office of Governor, and preventing a meeting of the Legislature and a decision of the contest for governor, and the appellant was cognizant of these facts.

4. We submit that while the acts of a *de facto* officer are good as to the public and innocent third persons, they are void as to himself and all persons acting under him with knowledge of the infirmity, under which he acts.

5. We deny *in toto* the doctrine of equitable set off by appellant. His obligation was to execute the duties of his office according to law, and it is not a compliance with that obligation to pay money out of the treasury where there is no appropriation, and not approved by proper authority.

6. We think a recovery may be had against appellants on account of any money paid out for supplies and subsistence of the active militia after the payment to Gen. Collier for that very purpose, while he had any money left in his hands irrespective of who was governor, or the validity of the account paid, and especially is this true where the money left in Collier's hands was wasted and used for things not a part of the necessary army supplies. The second payment was in fact a double payment by the State for the same thing; and we may recover from the auditor one of the sums.

## AUTHORITIES CITED.

Constitution, secs. 230, 143; Ky. Statutes, secs. 2704, 2703; Clayton v. Berry, 27 Ark., 131; 2 Story Constitution, 5 Ed., 1343; Restive, Auditor v. Board Com., 20 Ind., 323; Carr, Auditor v. State, 127 Ind., 204; Ingram v. Colgan, &c., 28 L. R. A., 187; Board of Health v. Stone, Auditor, 18 Rep., 456; Western Asylum v. Norman, Auditor, 27 S. W., 661 (16 Rep., 290); Powers v. Com., 22 Rep., 1329; Taylor v. Beckham, 21 Rep., 1733; U. S. v. Keehler, 9 Wallace, 83.

OPINION OF THE COURT BY JUDGE HOBSON—REVERSING.

Appellant Sweeney qualified as Auditor on December 27, 1899, and gave bond, with the Fidelity & Deposit Company of Maryland as surety. This action was brought upon his bond against him and his surety to recover for an alleged

breach of the bond by him in issuing the following warrants
upon the Treasurer on account of the active militia:

| | | |
|---|---|---|
| No. 6,280. | Jan. 31, 1900, to  D. R. Collier.......$10,044 | 13 |
| No. 6,320. | Feb. 2, 1900, to D. R. Collier........ 2,599 | 97 |
| No. 6,330. | Feb. 3, 1900, to A. C. Roberts............ 56 | 00 |
| No. 6,331. | Feb. 3, 1900, to C. F. Ward, etc...... 646 | 25 |
| No. 6,345. | Feb. 7, 1900, to C. C. Mengel, etc..... 12,612 | 95 |
| No. 6,346. | Feb. 7, 1900, to E. E. Power, etc .... 4,022 | 83 |
| No. 6,902. | Feb. 21, 1900, to John Shannon, etc... 8 | 00 |

$29,990 13

On the trial it was conceded that warrant 6,331, for
$646.25, was for a demand properly payable out of the treas-
ury, and no recovery was sought thereon, and no proof was
offered as to warrant 6,902, for $8. The other warrants
were on account of active militia called into service by W.
S. Taylor, as Governor, on January 30, 1900, after the as-
sassination of William Goebel. The court allowed the defend-
ants credit, by warrant 6,280 of date January 31, 1900, for
$10,044.13, as that was issued before the Legislature had
acted on the contest as to the office of Governor, and decided
in favor of Goebel; but the other warrants he held illegal,
as they were issued after the action of the General Assembly
declaring Goebel governor, and after he had taken the oath
of office. From this judgment the defendants appeal, and
the Commonwealth prosecutes a cross appeal.

It is insisted for the State that the Auditor had no right
to expend on account of the active militia anything outside of
the military fund, under section 2704, Ky. St., 1903. "There
is hereby appropriated the sum of ten thousand dollars per
annum, to be paid out of the treasury, from the resources
of the Kentucky war claim as the same shall hereafter be
collected from the United States, which together with all

sums received into the treasury from fines and penalties under the provisions of this law shall constitute the military fund of this State. This fund shall be disbursed from time to time by the authority of the Governor, and under such regulations as he shall prescribe, for the organization, administration equipping and uniforming the State Guard; for the purchase of tactics, laws and regulations of the army of the United States; for instruction of the State Guard; for the publishing of regulations for their government; for the renting of armories; for the purchase of such camp and garrison equipage and military stores as may be necessary, and, generally, as in his judgment may best promote the interests of the State Guard." The construction of this statute was before the court in Bryant v. Brown, 98 Ky., 211, 17 R., 801, 32 S. W., 741, and it was there held that this appropriation of $10,000 is to be expended by the Governor in the organization and perfecting of the State Guard. It was there also held that, when the militia are called into active service, they must be paid out of the treasury. The position of appellee, that there is no warrant of law for the payment of the militia when in active service out of the treasury, can not be maintained. Section 2705, Ky. St., 1903, after providing the salaries of certain officers, further provides as follows: "Other officers and men of the State Guard, when employed in active service, shall receive pay as follows:

Colonels, three dollars; lieutenant-colonels, two dollars and seventy-five cents; majors, two dollars and fifty cents; captains, two dollars and twenty-five cents; first lieutenants, two dollars; second lieutenants, two dollars; sergeants of and above the grade of first, two dollars; other sergeants and corporals, one dollar and seventy-five cents; and privates one dollar and fifty cents per day; the same to be paid out of the treasury on warrant of the Auditor of Public

Accounts, upon company pay rolls, accompanied by copies or certificates, of the orders bearing on the case, certified by the Adjutant General and approved by the Governor by his own signature. Each officer and each enlisted man shall also be entitled to one ration per day, and forage when mounted, the ration and forage to be the same as in the army of the United States, or commuted at the actual cost thereof, or of subsistence." By section 2672 it is further provided: "It shall be the duty of the Governor, whenever he may deem it necessary for the safety or welfare of the Commonwealth, or when any actual or threatened invasion, insurrection, domestic violence or other danger to the public interest makes it necessary to employ military force in aid of the civil power of the Government for the enforcement of the law, or to preserve the peace and the security of the rights and lives or property of the citizens, to order into active service so much of the State Guard or military force of the Commonwealth as he may deem necessary. The State Guard can be ordered into active service only by the Governor."

In the case before us, the Governor, in the exercise of the discretion committed to him by law, ordered out the militia. He was the only person to determine whether the militia should or should not be ordered out, and his determination is conclusive. We can not inquire as to whether there were sufficient grounds to justify his action, as by the statute he was authorized to call out the militia whenever he deemed it necessary for the welfare of the Commonwealth. When the governor had called the militia into service, they were in active service, and therefore entitled to pay as provided in section 2705, above quoted; and, the statute making no other provison, this pay must come out of the general fund in the treasury. In the past 25 years the militia has

Sweeney v. Commonwealth.

been often called into active service, and no special appropriation has been made by the Legislature to meet the charge. This construction of the statute by all three departments of the government would scarcely be departed from if this court had not heretofore reached the same conclusion in the case of Bryant v. Brown, above referred to. Warrant 6,331, for $646.25, for which no claim was made on the trial, was for the active militia called into service at Nicholasville a short time before the call of the militia to Frankfort. Counsel, in conceding this item, necessarily took the view of the statute we have indicated.

When the militia is called into active service, the men must not only be paid, but they must be fed, for no army can be kept together without food; and therefore it is provided by section 2707, Ky. St., 1903, as follows: "The acts of Congress for the government of the miltia of the United States are in force in this State. The articles of war and laws governing the army of the United States shall, so far as applicable, be a part of this law, and also the rules and regulations for said army, so far as consistent herewith, and subject to such modification as the governor may direct." By the United States regulations, the proper officer makes his requisition upon the Treasurer for the amount of money necessary, and uses the money, when paid over to him, in feeding the troops and providing for them. Of necessity, the same thing must be done with the State militia when called into active service. The adjutant gneral is *ex officio* quartermaster general of the militia, and the amount of check 6,280, for $10,044.13, was paid to him on a requisition certified by him, and approved by the Governor by his own signature.

Counsel for appellee refer us to Ristine v. Sinking Fund Com'rs, 20 Ind., 328, Ingram v. Colgan (Cal.) 38 Pac., 315.

366, 39 Pac., 437, 28 L. R. A., 187, Clayton v. Berry, 27 Ark., 131, and several cases decided by this court, all to the effect that money can be paid out of the treasury only in pursuance of an express appropriation made by law. But these cases have no application, for section 2705, Ky. St., 1903, after setting out the amount paid the militia are entitled to, expressly provides: "The same to be paid out of the treasury on warrant of the Auditor of Public Accounts." The check in question being for a claim that was certified as required by this section, we conclude that the judgment of the circuit court as to this item was correct, and on the cross appeal the judgment complained of is affirmed.

As to the other items, a different question is presented. The defendants offered proof tending to show that the Legislature did not take legal action upon the contest for the office of governor until February 19th, which was after all the money here in controversy was paid out, but the court declined to admit this evidence. The defendants also introduced proof tending to show that all of the money represented by these checks was to pay claims that were just demands against the treasury, insisting that, if the claims were not properly authenticated when paid, still, if they were in fact just claims, the State was not in fact damaged in any way by their payment, and there should be no judgment against the auditor on his bond. The court declined to make a finding on this subject, being of opinion that the auditor was responsible if he had paid out the money on the claims without the approval of the governor. The claims were all approved by W. S. Taylor as governor, but were not approved by Gov. Beckham, who qualified as governor on February 3d, after the death of Goebel. In Terrell v. Rowland, 86 Ky., 79, 4 S. W., 825, it was held that, where an executor had paid a claim which was not properly verified

under the statute, he should be credited by it upon proof that the claim was just. So it has been held in a suit upon a sheriff's bond for failure to collect an execution that there can be no recovery where it is shown that the money called for by the execution ought not to have been collected. Harrison v. Harrison, 1 Litt., 137. In State v. Baetz, 44 Wis., 624, an action was brought against the treasurer of the State upon his bond because he had paid $13,000 before it was due, without any warrant from the Secretary of State. It was held that there could be no recovery upon his bond, as there had been no loss to the State. The court said: "If the treasurer pays an appropriation in advance of the time of payment appointed by law, or if he pays it without the warrant of the Secretary of State, when such warrant is required, he takes the risk of being held liable upon his bond for any damages which may result to the State by reason of the irregular payment. But where the payment is made to a person to whom and for whose benefit the money is absolutely appropriated by law, and especially where the amount paid is placed to the credit of the Treasurer in the books of the Secretary of State (although perhaps irregularly), it is difficult to comprehend the principle upon which the State can recover the sum thus paid, in an action on the treasurer's bond, in which the payment of the money is assigned as the breach." The action before us rests on the ground, not only that the auditor did something that he ought not to have done, but on the further ground that thereby the State sustained damage. If there was no damage done to the State by the act of the auditor, there can be no cause of action on his bond. If a just debt of the State has been paid—one which, by mandamus, the courts would have required to be paid in a proceeding instituted for that purpose—then the State has sustained no loss by the irregular

action of the auditor in paying the money without having before him a proper voucher.

Appellee's counsel rely upon United States v. Kechler, 9 Wall., 83, 19 L. Ed., 574, and Smythe v. United States, 188 U. S., 163, 23 Sup. Ct., 279, 47 L. Ed., 425, but these cases rest on the strict rule against public officers which is upheld by the United States Supreme Court. This rule is rejected in many of the States, and the latter view has been followed by this court. Johnson v. Fleming, 50 S. W., 855, 21 Ky. Law Rep., 4. Appellant was a disbursing officer, and, if he made a mistake to the sufficiency of the voucher for which he drew his warrant, he took the risk. Still, if the debt was justly payable by the State, and the same result might have been reached by mandamus, he may show the facts here in defense of this suit. The vouchers upon which he paid the money being properly signed by Taylor as governor, and Collier as adjutant general, the disbursing agent, if he was mistaken as to the right to the offices which they were exercising, is not responsible to the State if the justice of the claims which he paid as debts against the State is established; for in this event his action, though irregular, has in no wise prejudiced the State. We therefore conclude that, if the demands paid by the auditor were of this character, he may show that fact in this suit to avoid liability on his bond.

It remains, then, to determine what was the character of the claims paid by the auditor. As we understand the evidence, the money was paid upon the pay rolls of the militia while in active service from January 30 until February 5, 1900, and for supplies for their subsistence during that time. As we have said, the troops were regularly called into service, and the State was liable for their pay as well as for their supplies while in service, unless they ceased to

Sweeney v. Commonwealth.

be properly in the service of the State before the expiration of the time for which they were paid. It is shown in the record that on the night of January 31st a proclamation was issued by William Goebel, as governor, by which, among other things, the first and second regiments of the Kentucky State Guard were ordered to return to their homes. But this proclamation does not appear to have been communicated to the officers in charge of the militia, and it would seen that on February 2d, the Legislature met, and declared Goebel elected, and he was then sworn in a second time, he having been sworn in the first time on January 31st. It is urged that there was no regular legislative action on January 31st, and in the suit to determine the right to the office only the action of February 2d was relied on. On the night of February 3d, Gov. Beckham issued a proclamation in which he commanded the militia of the State then in possession of the city and public buildings to immediately disband and return to their homes, relieving them all from duty. He also made an order appointing John B. Castleman adjutant general and relieving D. R. Collier. While all this was put upon the executive journal, it is not shown to have been communicated in any way to the soldiers. The defendants offered to prove on the trial that there was a conference between Collier and Castleman, the latter representing Gov. Beckham in the conference, in which it was agreed that the militia should remain on duty at the capitol until the suit to determine who was governor was tried, but the court declined to admit this evidence. The reason for this ruling apparently was that the governor alone has power to call the militia into active service, and when he had relieved all the men from duty the adjutant general was without authority to continue them in the service without action by the governor

officially. This seems to be true. Still the fact remains that Castleman, as adjutant general, issued no orders and took no steps to have the militia disbanded. The situation was a very anomalous one. There were two claimants of the office of governor. The troops had been regularly called into service. Being in active service, it was their duty to obey the orders of their superiors, and to maintain discipline as soldiers. They were in the performance of the duties for which they were called into service until they were by proper orders discharged from service. As between the soldier and the State, while he was obeying the orders of his superior and discharging his duty to the State as directed by them, the State having called him regularly into service should pay him while he remained in service until the State discharged him from the service by some order which a soldier could properly obey. A soldier must receive his orders from his superiors. The adjutant general has charge of the militia, and it is the duty of the adjutant general to give them orders. It is then their duty to obey his orders. It is certainly clear, from the record we have, that no regular orders were ever given these troops discharging them from active service. Soldiers who leave their post without orders are treated as deserters. When the State requires of them explicit obedience to the orders of their superiors, it can not require of them that they leave their post, and take the risk of being regarded as deserters and punished as such, until some orders have been issued through the regular channels which they should take notice of and properly obey. If the matter was doubtful, the soldier had a right to remain on duty. The rule applicable to the citizens of the State at large or usually applied between master and servant can not be strictly applied between the soldiers and the State in a case like this, where he asks pay for his services

actually rendered and the question is made that he had been discharged from the service; for the soldier is under the constraint of military discipline, and is not free to act. On January 31st, Taylor, as governor, issued a proclamation adjourning the Legislature to meet again at London on February 6th. The meetings of the General Assembly thereafter until February 19th were not held at the State House, because it was in the possession of the soldiers, who, under Taylor's orders, refused to admit the Legislature. These meetings were held at the Capitol Hotel at night, and without notice to the members of the Legislature who were not present. The validity of the action then taken was denied because the Legislature did not meet at the State House as required by law, and because a large part of both Houses had no notice of the meetings. When the Legislature met again at the State House on February 19th, it ratified its former action and readopted it. This action was publicly taken in the regular way at the State House, and after this there was no longer room for doubt as to the action of the Legislature. Until then, as the meetings of the Legislature had been without public notice, at night, at the Capitol Hotel, and no orders had been issued to the soldiers according to the usual course discharging them from the service, we do not think they were required to take the risk of being treated as deserters for leaving their posts. It was a very delicate situation, the like of which had never occurred in this State and, it is believed, will never occur again. It was managed with rare skill and judgment by Gov. Beckham and Gen. Castleman, and the State has reason to be proud of the conduct of her people under the trying circumstances. The State government is interested in maintaining the discipline of her soldiers, and no rule should be

laid down which would impair their efficiency, or lead them into disrespect of the orders of their superiors.

We therefore conclude that under the peculiar circumstances of the case the pay rolls for the soldiers and the expenses for their necessary subsistence were proper claims against the State, and that no recovery should be had on the auditor's bond for these things herein, although he paid them without proper vouchers. This conclusion makes it unnecessary for us to consider the other questions made in the argument, as they do not seem to be material for the decision of the case under the view we have indicated.

Judgment reversed, and cause remanded for further proceedings consistent herewith.

Judge Paynter dissents.